# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:21-cr-736 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| MARIAN RIPLEY, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Now before the Court is the motion of defendant Marian Ripley ("Ripley") to suppress all evidence derived from the search of her residence ("Weathervane") obtained through the execution of a search warrant on September 23, 2021. (Doc. No. 185 (Motion).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 198 (Response).)

Ripley initially requested an oral hearing on the motion. (Doc. No. 185, at 1.[1]) In a telephonic conference on October 25, 2022, the Court, without objection from either party, found a hearing was unnecessary because the motion presents strictly legal arguments that must be resolved by an examination of the four corners of the affidavit supporting the search warrant. (Minute Order, 10/25/2022.) *United States v. Goodwin*, 552 F. App'x 541, 548 (6th Cir. 2014) ("An evidentiary hearing is required only when the defendant has set forth contested issues of fact that bear upon the legality of the search." (quotation marks and citation omitted)); *see United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (probable cause is determined upon an examination

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

of the "four corners" of the supporting affidavit (citation omitted)).

For the reasons that follow, the motion to suppress is DENIED.

**I.     BACKGROUND**

The search in question was executed pursuant to a warrant issued by a magistrate judge of the United States District Court for the Northern District of Ohio (Doc. No. 185-1 (Search Warrant).) The search warrant, in turn, was supported by an affidavit sworn by Special Agent Christopher Fassler of the Federal Bureau of Investigation ("SA Fassler"). (Doc. No. 185-4 (Affidavit).) SA Fassler, a law enforcement officer with eleven years of service, averred that over the course of his career he has received specialized training and has gained experience in narcotics investigations. (*Id*. ¶ 2.)

Most of the forty-five-page affidavit detailed a multi-year investigation into a suspected drug trafficking organization ("DTO") operated by local leader Damien Stafford ("Stafford") (the "Stafford DTO") in the greater-Akron, Ohio, area. (*See id.* ¶ 8.) The affidavit outlined and described the various investigatory techniques employed by law enforcement—such as court-authorized interception of cellular phones, GPS tracking devices, surveillance, interviews, controlled buys, and social media searches—before seeking the warrant at issue herein. (*Id.* ¶ 6.) For example, the affidavit recounted intercepted telephone conversations between Stafford and associates, during which they seemed to discuss buying and/or selling narcotics, including methamphetamine. (*E.g.*, *id*. ¶¶ 56, 58.) The affidavit also described controlled purchases of methamphetamine and cocaine from Stafford and his associates. (*Id.* ¶¶ 15–17.)

The affidavit recorded several instances where electronic and physical surveillance of Stafford captured what officers believed were drug runs. Relevant here, in paragraph 56, the

2

affidavit describes one such drug run during which Ripley drove Stafford to Cleveland in tandem with Lucian Blackwell ("Blackwell"), a suspected member of the Stafford DTO. As recounted in the affidavit:

> Court-authorized intercepts of STAFFORD'S TT-3 on September 5, 2021, indicated STAFFORD would be travelling to a known corner store in Cleveland, Ohio, on September 6, 2021, to obtain eight "windows" from an Unknown Hispanic Male (UHM). Based on training and experience and the facts of the investigation, "windows" is a commonly used term in referring to pounds of crystal methamphetamine. Below is a summary of events from the September 6, 2021, intercepts and surveillance conducted by the FBI, APD, and ATF:
>
> 3:29 p.m.: STAFFORD received a call from the UHM and the two discussed STAFFORD travelling to Cleveland in approximately two hours.
>
> 3:51 p.m.: FBI surveillance observed a silver SUV arrive at WHITE POND.
>
> 3:52 p.m.: STAFFORD received an incoming call from BLACKWELL who advised he was "at the door."
>
> 4:06 p.m.: STAFFORD contacted . . . , a phone number associated with Marian Ripley (Ripley), . . . Weathervane Lane, . . . , Akron, OH 44313 (WEATHERVANE). STAFFORD asked Ripley if she would be ready in 30-45 minutes. She agreed. A search of OHLEG revealed Ripley is the registered lessee of a 2021 black Honda Accord bearing Ohio plate . . . (HONDA).
>
> 4:51 p.m.: Ripley contacted STAFFORD and stated she was coming to STAFFORD.
>
> 5:02 p.m.: Ripley contacted STAFFORD advising she was lost. STAFFORD directed her to WHITE POND.
>
> 5:08 p.m.: BLACKWELL advised STAFFORD he needed gas and directed STAFFORD to meet him at the BP gas station on Copley Road. At approximately the same time, investigators observed the HONDA departing WHITE POND.
>
> 5:14 p.m.: The HONDA registered to Ripley was observed parked in the driveway of VALDES. A silver 2013 Ford Edge bearing Ohio plate . . . was observed parked at a gas pump at the BP gas station on Copley Road. The vehicle is registered to Teonna Johnson, . . . . TFO Schmidt positively identified BLACKWELL as the male putting gasoline in the vehicle.

3

5:18 p.m.: STAFFORD called BLACKWELL who stated he was at the BP. STAFFORD advised he was about to pull in behind BLACKWELL and to just "follow her." STAFFORD confirmed he was in the HONDA. A short time later, surveillance observed the Ford Edge and HONDA travelling in tandem, entering northbound I-77 from White Pond Drive.

5:29 p.m.: STAFFORD called the UHM and confirmed he was riding together. The UHM directed STAFFORD to "send message."

5:30 p.m.: STAFFORD received an incoming text message from the UHM which read, "How long does it arrive at the address and what car does it bring?" STAFFORD replied, "Half hour."

5:34 p.m.: STAFFORD received an incoming text from the UHM which read, "ok my people are ready, just tell me what car are you in."

5:54 p.m.: STAFFORD replied to the UHM, "Grey suv." Several seconds later, STAFFORD texted, "6 minutes."

6:00 p.m.: The HONDA and silver Ford Edge pulled into the known corner store in Cleveland. STAFFORD placed an outgoing call to the UHM who asked STAFFORD, "You out there." STAFFORD indicated that he was. The UHM stated he was with his people.

6:03 p.m.: STAFFORD received an incoming text from the UHM which read, "have you seen my people?"

6:04 p.m.: Det. Morris and TFO Harvey observed a Hispanic male wearing a backpack approaching the known corner store.

6:05 p.m.: STAFFORD sent the UHM a text message which read, "Yup." Several seconds later, STAFFORD texted the UHM, "Tell him to come back to the suv." After the second text, STAFFORD placed a phone call to BLACKWELL and asked if someone just tried to come to his truck. BLACKWELL replied, "Yeah." STAFFORD said, "That was it."

6:06 p.m.: Surveillance units observed the Hispanic male wearing a backpack as he made contact with the Ford Edge containing BLACKWELL.

6:08 p.m.: BLACKWELL called STAFFORD and said, "It's cool."

6:09 p.m.: Det. Harvey observed the Hispanic male exit the Ford Edge and noted the backpack was not as heavy. Det. Morris observed the Hispanic male twirling the backpack before he walked away.

4

6:11 p.m.: The HONDA and silver Edge departed in tandem.

6:19 p.m.: BLACKWELL called STAFFORD and said, "I don't know if they split up already," and said he would meet STAFFORD "at the house."

6:38 p.m.: STAFFORD called BLACKWELL who said, "I'm about to look." STAFFORD said, "It's damn near time to get off or do you just want to follow me." BLACKWELL replied, "Yeah. Hop in front of me."

6:40 p.m.: Surveillance units observed the vehicles travelling in tandem as they exited I-77 southbound at Ridgewood Road. The vehicles travelled northbound on Miller Road and turned eastbound on Market Street before turning northbound onto Shawanasee. Surveillance units did not follow the vehicles onto Shawanasee as it is primarily a residential neighborhood.

6:46 p.m.: STAFFORD called BLACKWELL and asked, "Did dude leave it in the backpack or he just dump it out?" BLACKWELL replied, "In a black bag, man." A moment later, BLACKWELL called STAFFORD and asked, "You about to grab it up here?" STAFFORD replied, "Yeah around the corner."

6:58 p.m.: Precise location data from STAFFORD'S cellular telephone placed him in the vicinity of WEATHERVANE. A short time later, SA Edquist located Ripley's HONDA parked in front of WEATHERVANE where it remained until at least 7:15 p.m. when surveillance was terminated.

The application for a search warrant and affidavit sought permission to search Ripley's residence (Weathervane). (Doc. No. 185-1, Attach. A, at 3.) It also requested the seizure of drug-trafficking-related items, including controlled substances, U.S. currency in excess of $2,000, packaging materials, scales, drug paraphernalia, ATM receipts, personal papers, firearms, and cell phones (and their contents including contacts, call history, text messages, emails, voicemails, pictures, videos, and applications and their contents). (*Id*., Attach. B, at 4–5.) As justification for the search of Weathervane and seizure of drug trafficking-related items, the affidavit further provided:

> Based on the events [of September 5, 2021, described] above, I believe STAFFORD and BLACKWELL obtained eight pounds of crystal methamphetamine from the UHM in Cleveland before transporting the drugs back

5

> to WEATHERVANE in Ripley's HONDA. In that Ripley picked up STAFFORD on WHITE POND, transported him to VALDES prior to the trip, and returned with STAFFORD and the drugs to WEATHERVANE, there is probable cause to believe WEATHERVANE is another drug stash location for the STAFFORD DTO. This belief is supported by events from the following day as outlined below.

(Doc. No. 185-4 ¶ 57.)

The affidavit provided further support for the search of Weathervane by averring that

> On September 7, 2021, at approximately 8:01 p.m., STAFFORD spoke to an unknown male drug customer who ordered a quantity of unknown drugs. The unknown customer and STAFFORD discussed the customer paying for some of the drugs and getting the remainder fronted by STAFFORD. STAFFORD advised him that he was going to "send my people" with the drugs. Court-authorized tracking of HYSHAW'S CHEVROLET TRAX showed during the call the vehicle was at WHITE POND. Several minutes later, the CHEVROLET TRAX travelled to the area of WEATHERVANE before making a short-term stop on Copley Road, and ultimately returning to VALDES. Based on the aforementioned, I believe HYSHAW retrieved the drugs from WEATHERVANE before delivering them to the unknown drug customer and returned home to VALDES with the proceeds from the sale.

(*Id.* ¶ 58.)

The search warrant was signed on September 23, 2021, and executed the same day. At Weathervane, officers found Stafford and approximately 1,007 grams of fentanyl and 956 grams of ketamine, fluorofentanyl and fentanyl. (Doc. No. 185, at 7.) Although Ripley was not arrested at the time of the search, she was charged in a superseding indictment with one count of conspiracy to possess with intent to distribute methamphetamine, fentanyl, valeryl fentanyl, and cocaine, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (Doc. No. 34.) Ripley was arraigned on February 10, 2022, pled not guilty, and was given a personal bond. (Docs. No. 95,

6

96.) A jury trial is currently set to begin on January 9, 2023, on a one-week standby basis. (Doc. No. 160 (Ends of Justice Order).)

## II. LAW AND DISCUSSION

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. Amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir. 1995) (quoting *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical conception that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier*, 423 F.3d at 531).

"With great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *Moore*, 999 F.3d at 996 (citation omitted); *see Whiteley v. Warden*, 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); *Aguilar v. Texas*, 378 U.S. 108, 109 n.1, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Even if probable cause is lacking to support the issuance of a search warrant, a search may still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon*, 468 U.S. at 905). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922–23 n.23.

The good-faith defense will not apply, however, where: (1) the supporting affidavit contains information the affiant knew or should have known is false; (2) the issuing magistrate lacked neutrality and detachment; (3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable; or (4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted).

### A. Nexus Between Drug Trafficking and Weathervane

Ripley now seeks to suppress all evidence found in the search of Weathervane. She argues that the warrant affidavit failed to set forth probable cause to search Weathervane. In particular, she posits that the affidavit was devoid of any nexus connecting her or Weathervane to the Stafford DTO's drug trafficking. (Doc. No. 185, at 9.)

"To justify a search, the circumstances must indicate why evidence of illegal activity will

8

be found 'in a particular place[,]'" as opposed to some other place. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc); *see United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016). "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *Brown*, 828 F.3d at 381 (quotation marks and citation omitted, emphasis in original). The nexus requirement does not dictate that officers have unassailable, direct knowledge that evidence of illegal activity will be found in the location to be searched. Rather, as is the case with all probable cause inquires, officers need only present the issuing judge with sufficient evidence to allow for a "practical, common-sense" conclusion that "there is a fair probability that contraband or evidence of a crime will be found [at the place or thing to be searched]." *United States Washington*, 380 F.3d 236, 240 (6th Cir. 2004) (quoting *Carpenter*, 360 F.3d at 594).

Ripley contends the affidavit fails to establish a nexus "between her residence and her knowingly allowing the Stafford DTO to store drugs, currency, and weapons at her residence." (Doc. No. 185, at 9.) But this focus on Ripley's knowledge or potential wrongdoing is misplaced. The warrant sought permission to search Weathervane for evidence of drug trafficking; thus, the relevant inquiry is whether the affidavit established "a *nexus* between [Weathervane] and [evidence of drug trafficking]." *Brown*, 828 F.3d at 381. The warrant and SA Fassler's accompanying affidavit provided facts sufficient to establish this nexus.

SA Fassler's affidavit averred two separate occasions on which surveillance reasonably suggested that the Stafford DTO was keeping drugs at Weathervane. First, while Ripely was driving Stafford back from Cleveland, following Blackwell, who had likely received crystal methamphetamine in Cleveland, Blackwell called Stafford and asked him "You about to grab it up here?" Stafford replied, "Yeah around the corner." (Doc. No. 185-4 ¶ 56.) Shortly thereafter,

9

precise location data from Stafford's cellular phone placed Stafford in the vicinity of Weathervane. (*Id.*) SA Fassler averred that based on these events, he believed Stafford and Blackwell obtained eight pounds of crystal methamphetamine in Cleveland before transporting the drugs back to Weathervane.[2] (*Id.* ¶ 57.)

Second, on a separate occasion, SA Fassler averred that Stafford spoke to an unknown male drug customer who ordered a quantity of unknown drugs. (*Id.* ¶ 58.) Stafford told this customer that he was going to "send my people" with the drugs. GPS tracking of Stafford's associate Rausheeda Hyshaw's ("Hyshaw") vehicle showed her vehicle at Stafford's residence during the call. (*Id.*) Several minutes after the call, Hyshaw's vehicle "travelled to the area of Weathervane before making a short-term stop on Copley Road," and ultimately returning to her residence. (*Id.*) Based on these events, SA Fassler said that he believed "Hyshaw retrieved the drugs from Weathervane before delivering them to the unknown drug customer" and then returning home. (*Id.*)

Viewing the "totality of the circumstances," *Florida v. Harris*, 568 U.S. 237, 244, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013), through the "lens of common sense," as the Supreme Court has instructed, *id.* at 248, these facts collectively give rise to probable cause to believe that a search of

---

[2]SA Fassler avers that he believes Stafford and Blackwell transported the drugs back to Weathervane in Ripley's Honda. Ripley contends that this is a material misrepresentation in SA Fassler's affidavit because it is inconsistent with the recitation of events found earlier in his affidavit. (Doc. No. 185, at 11–12.) But there is nothing in the record to suggest SA Fassler was trying to mislead the magistrate judge. Rather, SA Fassler's recitation of events is consistent with a reasonable conclusion that the drugs were transported to Weathervane in Ripley's Honda. SA Fassler avers that Blackwell drove the drugs from Cleveland to Akron, where Stafford retrieved the drugs from Blackwell "around the corner." (Doc. No. 185-4 ¶ 56.) Minutes after Stafford retrieved the drugs "around the corner," surveillance detected both Ripley's Honda and Stafford present at Weathervane. (*Id.*) Thus, it is reasonable to conclude that Ripley drove Stafford and the drugs from the hand-off location to Weathervane. Further, for purposes of determining whether the search warrant was issued based on probable cause, whether Ripley or Blackwell drove the drugs back to Weathervane is immaterial. The material fact is that SA Fassler provided probable cause to find that drugs were transported back to Weathervane by someone connected to the Stafford DTO.

Weathervane would uncover evidence of drug trafficking.

### B. *Leon* Good Faith Exception

Even if the affidavit failed to provide probable cause for the warrant (which the Court concludes that it did), the good faith exception announced in *Leon* would still apply.

The Sixth Circuit has found *Leon*'s good faith exception applicable in cases where "the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause." *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006) (citing *Carpenter*, 360 F.3d at 596). The Sixth Circuit has found the "minimal nexus" satisfied "by the officer's reliance on his years of experience as a narcotics investigator and the knowledge he had acquired of drug dealers' business practices." *Id.* (citing *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994)).

Here, SA Fassler's affidavit was forty-five pages long and contained a substantial amount of detail about the underlying drug trafficking investigation. In sum, the investigation, through surveillance, controlled purchases, and other investigatory techniques, gave the officers a reasonable belief that Stafford and his associates were engaged in drug trafficking. Further, SA Fassler's affidavit described his knowledge of the habits of drug dealers, including his knowledge that "drug traffickers often place drugs and assets in hidden locations, known as 'stash houses,' to protect and conceal the location of those items from government agencies. Traffickers often avoid conducting transactions at these places but often do so in very close proximity to these locations[.]" (Doc No. 185-4 ¶ 2(d).) Surveillance conducted during the investigation gave officers a reasonable belief that Ripley was associated with Stafford and, based on their knowledge of drug dealers'

habits, that Ripley's residence was a potential "stash house" for the Stafford DTO, where evidence of drug trafficking might be found. (*Id.* ¶¶ 56–58.)

Because an officer would have been reasonably justified in relying on the warrant, believing in good faith that it was supported by probable cause, Ripley's motion to suppress must be denied. *See Untied States v. Merriweather*, 728 F. App'x 498, 504–05 (6th Cir. 2018).

## III. CONCLUSION

For the foregoing reasons, Ripley's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: November 18, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**